**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| GREE, INC., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Case No. 2:19-cv-00311-JRG-RSP |
| | § | |
| SUPERCELL OY, | § | |
| | § | |
| *Defendant*. | § | |

**MEMORANDUM ORDER**

Before the Court is Defendant Supercell Oy's ("Supercell") Motion to Strike Portions of GREE, Inc.'s Technical Expert Dr. Robert Akl ("Dr. Akl") Regarding Previously Undisclosed Infringement Opinions ("Motion"). **Dkt. No. 124**. Supercell's Motion seeks to strike opinions in Dr. Akl's expert report for three allegedly previously undisclosed and untimely infringement theories with respect to claim elements "game pieces" and "skill level information." These theories regard (1) "Clan XP" as the claimed "Game Piece" in Clash of Clans, (2) "skill level information" in Clash of Clans, and (3) "bunnies" and "sanctuary animals" as "Game Pieces" in Hay Day.

**I.  BACKGROUND**

In the above-captioned matter, Plaintiff GREE, Inc. ("GREE") alleges that Supercell has infringed U.S. Patent Nos. 9,079,107 (the "'107 Patent") and 9,561,439 (the "'439 Patent") (collectively, the "Oono Patents") with its mobile games Clash Royale, Clash of Clans, and Hay Day. Dkt. No. 1 at 1. Supercell's Motion regards infringement theories with respect to two claim terms: "game pieces" and "skill level information." Dkt. No. 124 at 4.

On January 28, 2020, GREE served its initial infringement contentions. Dkt. No. 124-1 at ¶ 3. GREE then served amended infringement contentions on August 3, 2020. *Id.*; Dkt. No. 124-2.

1

GREE's expert, Dr. Akl, served an expert report regarding infringement on November 2, 2020. Dkt. No. 124-1 at ¶ 4; Dkt. No. 124-3. Dr. Akl also served a supplemental report on December 1, 2020. Dkt. No. 124-1 at ¶ 5; Dkt. No. 124-4.

Supercell's Motion asks the Court to strike Dr. Akl's opinions regarding infringement theories that Supercell claims are previously undisclosed and untimely. Dkt. No. 124 at 5. These opinions relate to (1) "Clan XP" as the claimed "game piece" in Clash of Clans, (2) allegedly new theories as to what constitutes "skill level information" in Clash of Clans, and (3) "Bunnies" and "Sanctuary Animals" as the claimed "game piece" in Hay Day. Dkt. No. 124.

### A. "Clan XP" as a "game piece" in Clash of Clans

GREE's infringement contentions describe Clash of Clans' "Clan Wars" functionality. Dkt. No. 124-2 at 9–14. GREE's infringement contentions identify "Stars" as the "game piece." Dkt. No. 124-2 at 9 ("When the user succeeds in a Clan War event by performing a successful Clan War attack against an enemy Clan member, the server provides game pieces in the form of 'stars' to both the user and the overall clan."). GREE contends that when the required number of Stars were collected, the user would be provided with "Clan XP" as the claimed "game item." Dkt. No. 124-2 at 12 ("The server stores this allocation information for each user at each skill level as shown above and for the overall clan as shown below in which it also shows the number of stars required to obtain game items in the form of experience points which give Clan members various Clan perks.").

### B. "Skill level information" in Clash of Clans

GREE's infringement contentions assert that a player's number of "Trophies" meets the "skill level information" claim term. Dkt. No. 124-2 at 5. Dr. Akl asserts that "each player in the game can earn trophies by attacking other players' villages and winning, or by successfully

2

defending against an attack by another player." Dkt. No. 124-3 at 4. Further, "[t]rophies may be gained or lost by attacking and being raided, where trophies are gained when the player is victorious and trophies are lost when the player loses." *Id.*

Dr. Akl's expert report includes infringement theories wherein the "skill level information" claim term is met by "experience points" ("XP") gained "by progressing in the game and performing tasks such as completing achievements, upgrading buildings, donating troops, destroying other players' Town Halls, etc.", an "experience level" that increases "when they accrue enough experience points by progressing through the game in the manner described above," and the "level, quantity, and type of [] in-game assets" such as "troops, [] Hero units, and [] defensive structures, walls, and traps within the game to use for attacking other villages and defending their own villages." *Id.*

### C. "Bunnies" and "sanctuary animals" in Hay Day

GREE's infringement contentions assert that "Derby Points" in Hay Day's Neighborhood Derby event meet the "game pieces" term. Dkt. No. 124-2 at 15. ("The Hay Day server provides one or more game pieces to the first plurality of users in a Neighborhood (a first group) during the Neighborhood Derby event, where users can earn derby points (game pieces) for the Neighborhood."). Dr. Akl asserts that "[i]n the Derby, members of a neighborhood . . . may participate together in a number of challenges. . . . When a player in the neighborhood completes a challenge, Hay Day will award the player who completed the challenge and their neighborhood a predetermined number of derby points . . . ." Dkt. No. 124-3 at 36.

Dr. Akl's expert report includes an infringement theory where "in the Neighborhood Derby, a particular type of Derby called a 'Bunny Derby'" is periodically offered and during an active Bunny Derby "completing a task . . . will earn the player derby points (i.e., horseshoes) and

3

a single 'Bunny Point,' which will get the player and their neighborhood closer to catching a 'Bunny' in the Derby to acquire additional rewards." *Id.* at 35. Supercell argues that this is a new theory that is untimely and should be struck. Dkt. No. 124 at 10. GREE argues that Bunny Derby is, as expressed by Dr. Akl, "a particular type of Derby" with Bunny Points functioning essentially the same way as Derby Points. Dkt. No. 136 at 16 (citing Dkt. No. 124-3 at 35).

GREE's infringement contentions also assert that "red, green, and blue tokens" in Hay Day's "The Valley" meet the "game pieces" term. Dkt. No. 124-2 at 18–19. The infringement contentions further claim that "[i]n The Valley, a user increasing the sanctuary animal parameter by delivering animals to the sanctuary is awarded game pieces in the form of red, green, and blue tokens." *Id.* at 18. Furthermore, the infringement contentions assert that "game piece rewards for delivering sanctuary animals, causes game pieces shown in storage to increase" in a text box with a pointer pointing to an image where red, green, and blue token counts are displayed. *Id*. at 19.

Dr. Akl's report includes opinions relating to Sanctuary Animals. For example, the opening infringement report of Dr. Akl states: "If all of the players in the Valley have collected enough sanctuary animals, the game unlocks the 'exclusive shop' where players can receive rewards." Dkt. No. 124-3 at 38. In the supplemental infringement report, Dr. Akl states: "If the participants in the Valley have not gathered enough Sanctuary Animals, then the a [sic] portion of the valley shop containing rewards will be unavailable." Dkt. No. 124-4 at 10.

All considered, Supercell seeks to have the following paragraphs struck for improperly introducing new infringement theories: Opening Infringement Report of Dr. Akl dated November 2: ¶¶ 85, 86, 94–97, 101–03, 106, 111, 124, 129, 130, 134, 135, 181, 185–87, 191, 195, 203, 287, and 337; and Supplemental Infringement Report of Dr. Akl dated December 1: ¶¶ 18, 22–24, and 33.

## II.      LEGAL STANDARDS

An expert witness may provide opinion testimony if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

Rule 702 requires a district court to make a preliminary determination, when requested, as to whether the requirements of the rule are satisfied with regard to a particular expert's proposed testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993). District courts are accorded broad discretion in making Rule 702 determinations of admissibility. *Kumho Tire*, 526 U.S. at 152 ("the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable"). Although the Fifth Circuit and other courts have identified various factors that the district court may consider in determining whether an expert's testimony should be admitted, the nature of the factors that are appropriate for the court to consider is dictated by the ultimate inquiry—whether the expert's testimony is sufficiently reliable and relevant to be helpful to the finder of fact and thus to warrant admission at trial. *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

Importantly, in a jury trial setting, the Court's role under *Daubert* is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role; instead, the Court's role is limited to that of a gatekeeper, ensuring that the evidence in dispute is at least sufficiently reliable and relevant to the issue before the jury that it is appropriate for the jury's consideration. *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391-92 (Fed. Cir. 2003) (applying Fifth Circuit law)

("When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony."); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249-50 (5th Cir. 2002) ("'[t]he trial court's role as gatekeeper [under Daubert] is not intended to serve as a replacement for the adversary system.' . . . Thus, while exercising its role as a gate-keeper, a trial court must take care not to transform a *Daubert* hearing into a trial on the merits," quoting Fed. R. Evid. 702 advisory committee note). As the Supreme Court explained in *Daubert*, 509 U.S. at 596, "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *See Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002).

When information is publicly available, the Patent Rules require plaintiffs to set forth specific theories of infringement at the outset of the case. *See Am. Video Graphics, L.P. v. Elec. Arts, Inc.*, 359 F.Supp.2d 558, 560 (E.D. Tex. 2005). Patent Rule 3-1 requires plaintiffs to state "specific theories of infringement" in its infringement contentions. *STMicroelectronics, Inc. v. Motorola, Inc.*, 308 F.Supp.2d 754, 755 (E.D. Tex. 2004). Compliance with Patent Rule 3-1 demands infringement contentions that describe "particular theories of infringement with sufficient specificity to provide defendants with notice of infringement beyond that which is provided by the mere language of the patent [claims] themselves." *Connectel, LLC v. Cisco Systems, Inc.*, 391 F.Supp.2d 526, 527–28 (E.D. Tex. 2005) (quoting *STMicroelectronics, Inc.*, 308 F.Supp.2d at 755). Before bringing suit, plaintiffs are expected to rigorously analyze all publicly available information, and early in the case plaintiffs must explain their infringement theories in detail. *See id.* at 528.

However, a plaintiff need not provide evidence for "every possible manifestation of the alleged infringement" in its infringement contentions. *Orion IP, LLC v. Staples, Inc.*, Case No. 2:06-cv-00297-LED, Dkt. No. 316, 407 F. Supp. 2d 815, at *3 (E.D. Tex. 2006). A plaintiff need only provide "representative examples of the alleged infringement so as to give defendants fair notice of infringement beyond that which is provided by the mere language of the patent claims themselves." *Id.* For example, in software cases, the Court has recognized the pragmatic limitation on infringement contentions when plaintiffs do not have the necessary access to non-public software, which is needed to make detailed infringement contentions. *See Am. Video Graphics*, 359 F.Supp.2d at 560.

### III. ANALYSIS

At the heart of most of the disputes in Supercell's Motion is whether opinions expressed in expert reports regarding infringement that are not explicitly discussed in GREE's infringement contentions are new theories that have not been properly disclosed or merely additional examples of a theory previously disclosed. GREE cites to *Orion IP, LLC* as illustrative of representative examples.

In *Orion IP, LLC*, Orion IP, LLC ("Orion") alleged that defendant Toyota Motor Sales U.S.A.'s ("Toyota") website infringed one of Orion's patents. *Orion IP, LLC*, 407 F. Supp. 2d at 816, Dkt. No. 316 at *1. More specifically, Orion asserted infringement against the pathways in Toyota's website and provided screenshots from the "Model Selector" section of the website. *Id.* at 817, *2–3. The court in *Orion IP, LLC* stated that:

> Toyota's website is not a static object that can only function in one manner, rather it is dynamic and interactive. There are innumerable paths a user can take to get from one page to another. In dealing with something like a website, it would be unrealistic to expect plaintiffs to provide screen shots for every possible manifestation of the alleged infringement. Instead, plaintiffs should provide specific

7

> theories of infringement and representative examples of the alleged infringement so as to give defendants fair notice of infringement beyond that which is provided by the mere language of the patent claims themselves.

*Id.* at 817, *3. The court in *Orion IP, LLC* rejected Toyota's argument that Orion's infringement contentions did not provide notice as Orion repeatedly requested discovery related to the entire Toyota website. *Id.*

The language in *Orion IP, LLC* suggests that the "dynamic and interactive" nature with "innumerable paths a user can take to get from one page to another," where the paths were the source of alleged infringement, are what made it "unrealistic to expect plaintiffs to provide screen shots for every possible manifestation . . . ." *See Id.* The substantial similarity of the functionality of the paths, along with the "innumerable" instances of them, enabled Orion to capture all of the additional examples laid out in later expert reports with the exemplary disclosure in the infringement contentions.

### A. "Clan XP" as a "game piece" in Clash of Clans

GREE's infringement contentions identify "Stars" as the "game piece." Dkt. No. 124-2 at 9 ("When the user succeeds in a Clan War event by performing a successful Clan War attack against an enemy Clan member, the server provides game pieces in the form of 'stars' to both the user and the overall clan."). GREE contends that when the required number of Stars were collected, the user would be provided with "Clan XP" as the alleged "game item." Dkt. No. 124-2 at 12 ("The server stores this allocation information for each user at each skill level as shown above and for the overall clan as shown below in which it also shows the number of stars required to obtain game items in the form of experience points which give Clan members various Clan perks.")

Supercell argues that Dr. Akl's opinion that the "game pieces" requirement is met by "Clan XP" is a new infringement theory. Dkt. No. 124 at 7. Supercell says that while GREE's

infringement contentions asserted "Stars" as "game pieces" and "Clan XP" as the "game items" provided when enough stars were collected, it did not assert that Clan XP could also be the game pieces. *Id.*

GREE responds that Dr. Akl's opinion regarding Clan XP as the "game pieces" rather than the "game item" is not a new infringement theory, but rather an additional example of infringement "consistent with the theory and representative example." Dkt. No. 136 at 13. GREE asserts that Supercell's expert Dr. Zagal concedes that players can win both Stars and Clan XP as a result of successful attacks and that Dr. Zagal provides the same noninfringement opinion: that they "are also simply scores, or forms of abstract quantity or measurement of the in-game progress (wherein progress is based on time and/or currency/money spent in the game)." *Id.* at 14 (quoting Dkt. No. 137-1 at 25). GREE argues that this indicates that Dr. Akl has not disclosed a new theory, but rather an additional example of the already disclosed theory. *Id.*

Supercell replies that "GREE did not previously identify Clan XP in its contentions as a 'game piece,' and in fact only identified Clan XP as meeting a completely different claim element, the 'game item.'" Dkt. No. 150 at 6. Supercell asserts that Clan XP is provided by "achieving reward tiers in Clan Games." *Id.* (citing Dkt. No. 136-2 at 1). Supercell argues that GREE is "taking liberties" with its characterization of Clan XP "game pieces" as an additional example rather than a new theory. *Id.*

GREE sur-replies that Clan XP is provided in the same manner as Stars and that Clan XP may be earned in additional ways is immaterial. Dkt. No. 162 at 4. GREE argues that as such Clan XP is another example and not a new theory altogether. *Id.*

The Court is convinced that Clan XP is an additional example that properly falls under the umbrella of the Stars as "game pieces" infringement theory. GREE's infringement contentions

9

addressed Clan XP as the "game item," but also sufficiently described its functionality to provide fair notice to Supercell that it is also asserted as a "game piece." With this sufficient description of the functionality, GREE does not need to specifically call it out as also a "game piece" to provide fair notice. Clan XP is asserted as obtained the same way as Stars, and the assertion that there are alternative methods of collection does not change that. Accordingly, the Court to thinks it is proper to deny Supercell's Motion with respect to Clan XP as a "game piece" as an additional example of a fairly disclosed theory.

### B.  "Skill level information" in Clash of Clans

GREE's infringement contentions asserted that a player's number of "Trophies" meets the "skill level information" claim term. Dkt. No. 124-2 at 5. Dr. Akl asserts that "each player in the game can earn trophies by attacking other players' villages and winning, or by successfully defending against an attack by another player." Dkt. No. 124-3 at 4. Further, "[t]rophies may be gained or lost by attacking and being raided, where trophies are gained when the player is victorious and trophies are lost when the player loses." *Id.*

Dr. Akl's expert report includes infringement theories where the "skill level information" claim term is met by "experience points" ("XP") gained "by progressing in the game and performing tasks such as completing achievements, upgrading buildings, donating troops, destroying other players' Town Halls, etc.," an "experience level" that increases "when they accrue enough experience points by progressing through the game in the manner described above," and the "level, quantity, and type of [] in-game assets" such as "troops, [] Hero units, and [] defensive structures, walls, and traps within the game to use for attacking other villages and defending their own villages." *Id.*

Supercell argues that while GREE's infringement contentions asserted that the "skill level information" element is met by the player's number of "trophies," Dr. Akl's opinions that experience points, experience level, and the level, quantity, and type of in-game assets is a new theory. Dkt. No. 124 at 8–10. Supercell further argues that Dr. Akl's opinions that game pieces provided based on level and type of in-game assets meet "providing one or more of a plurality of game pieces . . . based on the skill level information" are also new. *Id.* at 10.

GREE responds that "[t]he contentions provide one example of such 'skill level information,'" and that experience points, experience levels, and the level, quantity, and type of in-game assets are merely additional examples of "skill level information" in Clash of Clans. Dkt. No. 136 at 11. GREE argues that under *Orion IP*, GREE sufficiently disclosed and put Supercell on notice of its infringement theory with respect to "skill level information." *Id.* GREE asserts that Dr. Zagal, basing his rebuttal opinions of all of the above on the same underlying contention that each is "primarily increased by spending time and currency/money in the game," and thus is "not indicative of a player's skill or skill level in the game in any meaningful way" evidences that these examples all fall under the same theory. *Id.* (quoting Dkt. No. 137-1 at 12–16).

Supercell replies that these are not additional examples, but rather new theory, and argues that "notably, that theory—and in particular, that a 'player's progress' constitutes 'skill level information'—was never disclosed in GREE's contentions." Dkt. No. 150 at 4 (citing Dkt. No. 124-2 at 5–6).[1] Supercell counters that "trophies are entirely and fundamentally different" from these other theories as "[t]hese features operate differently, and are obtained by players in different ways." *Id.* at 4. Supercell argues as an example that a player's number of Trophies depends on

---

[1] The Court notes the citation was "*See* Dkt. No. 124-3 (GREE Amended Infringement Contentions) at p. 59-60." Dkt. No. 124-3 is Dr. Akl's Report, while Dkt. No. 124-2 is GREE's Amended Infringement Contentions. The context suggests intent to cite to Dkt. No. 124-2.

their success at attacking and defending against other players while in-game assets require players "collect resources, such as coins and Elixir and [] wait a requisite amount of time" or "spend[] gems" that are "primarily obtained via in-app purchases." *Id.* at 4–5 (citing Dkt. No. 137 at ¶ 19). Supercell further argues that while Trophies can only be earned through success in battles against other players, "XP is earned in a vast number of ways, including building and upgrading buildings, donating troops and spells, clearing obstacles, completing tasks in events, and other ways that are unrelated to success in a battle against another player and are simply based on 'spending time and currency/money in the game.'" *Id.* at 5.

GREE sur-replies that while Supercell argues that XP can be earned in other ways, "that does not change the fact that 'XP' is also awarded in the same manner as trophies." Dkt. No. 162 at 3. GREE further argues that other in-game assets are, like Trophies, earned as a result of a successful attack and that medals are awarded based on skill level information "in a number of different ways, including, for example, based on the 'trophy' or 'level' of a user." *Id.* at 3–4.

The Court finds this dispute to be similar to the dispute regarding Clan XP as a "game piece." That resources may be obtained in a myriad of other ways does not change that they assertedly may be earned as a result of a successful attack against other players like Trophies. Accordingly, the Court considers it proper to deny Supercell's Motion with respect to these asserted additional examples regarding skill level information.

### C. "Bunnies" and "sanctuary animals" in Hay Day

GREE's infringement contentions assert that "Derby Points" in Hay Day's Neighborhood Derby event meets the "game pieces" term. Dkt. No. 124-2 at 15. ("The Hay Day server provides one or more game pieces to the first plurality of users in a Neighborhood (a first group) during the Neighborhood Derby event, where users can earn derby points (game pieces) for the

12

Neighborhood."). Dr. Akl asserts that "[i]n the Derby, members of a neighborhood . . . may participate together in a number of challenges. . . . When a player in the neighborhood completes a challenge, Hay Day will award the player who completed the challenge and their neighborhood a predetermined number of derby points . . . ." Dkt. No. 124-3 at 36.

Dr. Akl's expert report includes an infringement theory where "in the Neighborhood Derby, a particular type of Derby called a 'Bunny Derby'" is periodically offered and during an active Bunny Derby "completing a task . . . will earn the player derby points (i.e., horseshoes) and a single 'Bunny Point,' which will get the player and their neighborhood closer to catching a 'Bunny' in the Derby to acquire additional rewards." *Id.* at 35. Supercell argues that this is a new theory that is untimely and should be struck. Dkt. No. 124 at 10. GREE argues that Bunny Derby is, as expressed by Dr. Akl, "a particular type of Derby" with Bunny Points functioning essentially the same way as derby points. Dkt. No. 136 at 16 (citing Dkt. No. 124-3 at 35).

Supercell argues that Dr. Akl's opinion that the "game pieces" requirement is met by "Bunnies" is a new infringement theory. Dkt. No. 124 at 11–12. Supercell further argues that Dr. Akl admits that Bunnies are "entirely different" from Derby Points, quoting Dr. Akl's opinion that "in the Neighborhood Derby, a particular type of Derby called a 'Bunny Derby' is periodically offered . . . where players . . . catch 'Bunnies,' which are a game piece separate from derby points (i.e., horseshoes)." The Court is not persuaded that this distinction between Derby Points and Bunnies is an admission that they are "entirely different" so much as a note that they are not precisely the same resource.

GREE responds that in its contentions, it contends that "Derby Points" awarded in The Derby event satisfy the claimed "game pieces." Dkt. No. 136 at 16. GREE argues that Dr. Akl provides the same theory "including with respect to the 'Bunny Derby' ('a particular type of

13

Derby') and 'Bunny Point(s)' available therein, which function essentially the same way as derby points . . . ." *Id.*

Supercell replies, "[t]he record is clear that all that was disclosed in GREE's contentions were 'derby points,' whereas the disputed opinion relates to 'bunny points'—which Dr. Akl explained 'are a game piece separate from derby points'" and asserts that Bunny points are not merely an additional example of a previously disclosed theory. Dkt. No. 150 at 7–8 GREE sur-replies that Supercell disputes neither that a "Bunny Derby" is a particular type of Derby nor that "Bunny Points" function the same way as "Derby Points" in a generic Derby and that Supercell's argument is "nothing more than an improper request to strike an additional example of Derby Points in 'a particular type of Derby' (a 'Bunny Derby')." Dkt. No. 162 at 5–6.

Supercell's argument hinges on Dr. Akl's admission that Bunny Points "are [] game piece[s] separate from derby points." An admission of a distinction between Bunny Points and Derby Points is a far cry from admitting the two are "entirely different." Supercell does not respond to GREE's assertion that a Bunny Derby is a particular type of Derby and that Bunny Points function the same way as Derby Points in a generic Derby. Supercell does not allege any way that Bunny Points function differently from Derby Points. The Court finds that Bunny Points and Derby Points are two distinct examples of the same theory. Accordingly, the Court finds it proper to deny the request to strike opinions regarding Bunny Points.

GREE's infringement contentions also assert that "red, green, and blue tokens" in Hay Day's "The Valley" meets the "game pieces" term. Dkt. No. 124-2 at 18–19. The infringement contentions further claim that "[i]n The Valley, a user increasing the sanctuary animal parameter by delivering animals to the sanctuary is awarded game pieces in the form of red, green, and blue tokens." *Id.* at 18. Furthermore, the infringement contentions assert that "game piece rewards for

14

delivering sanctuary animals, causes game pieces shown in storage to increase" in a text box with a pointer pointing to an image where red, green, and blue token counts are displayed. *Id*. at 19.

Dr. Akl's report also includes opinions relating to Sanctuary Animals. For example, the opening infringement report of Dr. Akl states: "If all of the players in the Valley have collected enough sanctuary animals, the game unlocks the 'exclusive shop' where players can receive rewards." Dkt. No. 124-3 at 38. In the supplemental infringement report, Dr. Akl states: "If the participants in the Valley have not gathered enough Sanctuary Animals, then the a [sic] portion of the valley shop containing rewards will be unavailable." Dkt. No. 124-4 at 10. Supercell argues that Dr. Akl appears to be asserting a new theory where "Sanctuary Animals" are "game pieces," while GREE's infringement contentions only asserted "game pieces in the form of red, green, and blue tokens." Dkt. No. 124 at 12 (quoting Dkt. No. 124-2 at 18).

GREE responds that Supercell is misinterpreting Dr. Akl's reports, stating that "[n]owhere does Dr. Akl state that 'sanctuary animals' in The Valley are the claimed 'game pieces.'" Dkt. No. 136 at 15. GREE further asserts that "Dr. Akl's opinions [are] in response to purported non-infringement theories that Supercell and its expert . . . advanced." *Id.* (citing Dkt. No. 124-3 at ¶ 337; Dkt. No. 124-4 at ¶ 33). The cited paragraph of Dr. Akl's report reads:

> I have further been informed and understand that Supercell has argued that it does not meet this element because it contends that the number of animals collected does not determine how many tokens are given to each user. I disagree, because as explained above, users receive tokens for collecting sanctuary animals and dropping them off at the animal sanctuary. If all of the players in the Valley have collected enough sanctuary animals, the game unlocks the "exclusive shop" where players can receive rewards.

Dkt. No. 124-3 at ¶ 337. The cited paragraph of Dr. Akl's supplemental report reads:

> In paragraph 18 of Appendix B to his rebuttal report, Dr. Zagal identifies source code . . . to claim that "[t]he making available of rewards through the Valley shop … is unrelated to the number of

15

> tokens that a player has." . . . As discussed in my Initial Report (-311 case), LogicMapGameShowRewardsManager.cpp determines if the player has obtained the required tokens and Sanctuary Animals in order to purchase certain rewards at the end of The Valley season. . . . If the a [sic] participants in the Valley have not gathered enough Sanctuary Animals, then the a [sic] portion of the Valley shop containing rewards will be unavailable. In addition, if a player has not acquired sufficient tokens to purchase items in that portion of the Valley shop, the rewards will also not be available, such that both sanctuary animals and tokens are required, with the tokens associated with the particular user.

Dkt. No. 124-4 at ¶ 33.

Supercell replies that Dr. Akl's statements have "no purpose other than to impermissibly suggest that sanctuary animals are 'game pieces.'" Dkt. No. 150 at 7. Supercell's reply does not respond to GREE's assertion that the opinion is used as a response to Dr. Zagal's noninfringement theories.

GREE sur-replies, "[t]he specific opinions of Dr. Akl that Supercell seeks to strike are his opinions in response to non-infringement positions advanced by Supercell . . . ." Dkt. No. 162 at 5. GREE argues that Supercell's assertion that the opinions have no purpose other than to impermissibly suggest that Sanctuary Animals are game pieces "ignores the undisputed relationship between 'sanctuary animals' and 'tokens'—only the latter of which Dr. Akl opines satisfies the claimed 'game pieces.'"

After reviewing the paragraphs cited where GREE asserts that Dr. Akl's opinions regarding Sanctuary Animals are responses to Dr. Zagal's noninfringement theories, the Court finds that assertion supported. Supercell repeats its argument that Dr. Akl's opinions have no purpose other than to impermissibly suggest that Sanctuary Animals are game pieces in its reply, but does not respond to GREE's assertion that the opinions are responsive. *See* Dkt. No. 150 at 7. Considering the apparent relationship between Sanctuary Animals and 'tokens' and GREE's unrebutted

16

assertion that the opinions are responsive, the Court **DENIES** Supercell's request to strike Dr. Akl's opinions regarding Sanctuary Animals.

### D. Prejudice

Supercell argues that Dr. Akl's new previously undisclosed theories are highly prejudicial to Supercell because these arguments necessarily result in entirely new infringement theories. Dkt. No. 124 at 14. Supercell further argues that Supercell has been denied the opportunity to address the new theories with respect to invalidity contentions, claim construction, and discovery, including performing surveys on non-infringing alternatives. *Id.*

GREE responds that Supercell's expert Dr. Zagal has addressed and provided rebuttal opinions with respect to each of the new theories. Dkt. No. 136 at 16. GREE argues that Dr. Zagal has opined that none of the accused features satisfy the claimed "skill level information" for "substantially the same reasons" and that despite the late disclosure, Supercell and Dr. Zagal identified source code related to the accused features to support Dr. Zagal's rebuttal opinions. *Id.* at 16–17.

GREE asserts that the facts here are similar to *Cybergym Research LLC*, "where the Court denied the defendant's motion to exclude a 'purportedly new theory of infringement' given that the defendant's rebuttal expert report addressed the purported new theory." *Id.* at 17 (citing *Cybergym Research LLC v. ICON Health & Fitness, Inc.*, Case No. 2:05-cv-527-DF, 2007 WL 9724605, at *2 (E.D. Tex. Oct. 7, 2007)). GREE further argues that Supercell, as the accused product owner, does not need additional discovery, and did not provide details how claim construction and invalidity contentions are affected. *Id.* at 18. Finally, GREE asserts that Supercell had "more than four weeks" of expert discovery remaining. *Id.* The Court finds these arguments persuasive.

Supercell replies that GREE's argument neglects that the acceptability of a non-infringing alternative must be supported by evidence and four weeks is not sufficient time to conduct the surveys to produce such evidence. Dkt. No. 150 at 8. Supercell further argues that just because Dr. Zagal addressed the new theories in rebuttal does not mean Supercell has suffered no prejudice.

The Court recognizes Supercell's point. The fact that Dr. Zagal addressed the new theories does not foreclose prejudice: if Dr. Zagal were to not even attempt to address the new theories and the Court were to not recognize the new theories as such, the new theories would go unrebutted. It is only reasonable to at least attempt to address the new theories, even if not to the degree of detail possible with proper time to conduct non-infringing alternative surveys and make claim construction arguments about them.

However, the Court has found each instance of an allegedly new theory asserted in Supercell's Motion to be merely additional examples of existing theories. Accordingly, the Court finds that there is no prejudice created by the clear illustration of these additional examples.

## IV.    CONCLUSION

The Court **DENIES** Supercell's Motion.

**SIGNED this 11th day of February, 2021.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE